**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-CT-02395-SCT**

*JOSEPH THOMPSON, BY AND THROUGH HIS MOTHER AND NEXT FRIEND, NANCY THOMPSON*

*v.*

*LEE COUNTY SCHOOL DISTRICT*

**ON WRIT OF CERTIORARI**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/09/2003 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | J. MARK SHELTON |
| | JANA DAWSON |
| ATTORNEYS FOR APPELLEE: | WILLIAM C. MURPHREE |
| | GARY L. CARNATHAN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 01/19/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Joseph Thompson, by and through his mother and next friend, Nancy Thompson, filed suit in the Lee County Circuit Court pursuant to the Mississippi Tort Claims Act (MTCA), Miss. Code Ann. Sections 11-46-1 et seq., against George Gregory and the Lee County School District for injuries from an accident involving a vehicle driven by Thompson and a Lee County

school bus driven by Gregory. After a bench trial, the Lee County Circuit Court, Judge Thomas J. Gardner, III, presiding, found: Lee County liable for the accident and assessed damages in the amount of $200,000; and Thompson fifty percent contributorily negligent. Judgment was entered against Lee County and in favor of Thompson in the amount of $100,000. Thompson appealed from this final judgment, claiming error on the part of the circuit court in the assessment of contributory negligence against him, and in the assessment of damages, which Thompson claimed to be inadequate. We assigned this case to the Court of Appeals, which reversed the trial court's assignment of comparative negligence to Thompson; rendered judgment in favor of Thompson and against Lee County on the issue of negligence; reversed the trial court's award of damages as inadequate and unreasonable; and remanded the case for a new trial as to damages. ***Thompson v. Lee County School District***, __ So.2d __, 2005 WL 895026 (Miss. Ct. App. 2005). Upon a grant of certiorari, we find the Court of Appeals erred. We reverse the judgment of the Court of Appeals and reinstate and affirm the final judgment entered by the Circuit Court of Lee County.

### FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. The following facts are gleaned from the opinion of the Court of Appeals:

On December 4, 1998, Thompson was driving his red truck in the northbound lane of Romie Hill Road, a two-lane road in Shannon, Mississippi. As Thompson approached the intersection of Romie Hill Road and County Road 300, the school bus driven by Gregory pulled out in front of Thompson, causing a collision between the two vehicles. Fortunately, the bus was empty of children at the time. There were no stop signs or stop lights to halt or slow traffic proceeding north or southbound on Romie Hill Road; thus, Thompson was proceeding with the right of way and without any traffic signal requiring him to slow down or stop. There were stop signs on each of the eastbound and

2

westbound sides of County Road 300; thus, the school bus had to proceed through a stop sign in order to enter Romie Hill Road. Whether Gregory came to a complete stop at this stop sign before entering Romie Hill Road became one of the contested factual issues in the case, but there was no dispute about the fact that Thompson faced no road sign, traffic light, or other warning signal as he approached the intersection of Romie Hill Road and County Road 300.

Gregory suffered only minor injuries from the collision, but Thompson suffered numerous injuries, including severe head trauma. Thompson was taken to the emergency room at North Mississippi Medical Center where he remained in a coma for three days. Thompson remained hospitalized until December 31, 1998, incurring roughly $50,000 in medical bills from his extended stay at the hospital.

Experts at trial testified that while Thompson has made a virtually full physical recovery, he suffers from permanent cognitive defects as a result of the head injuries caused by the accident. Among these permanent cognitive defects are the following: loss of language skill, mild dysnomia, reduced motor functioning and coordination, abnormally reduced attentional skills, mental slowness and inefficiency in learning, and visual perceptual difficulties.

*Id.* at **1 ¶¶ 4-6

¶3.   Joseph Thompson (Joey) was nineteen years old at the time of the accident and twenty years old at the time this suit commenced.   After considerable discovery and several continuances, a bench trial was conducted before Judge Gardner on October 6, 2003.   Six witnesses testified in Joey's case-in-chief:   Robert Gwin, the Shannon police officer who investigated the accident;[1] George Gregory, the school bus driver; Jay Miller, the head coach and defensive coordinator at Itawamba Community College in Fulton;[2] Nancy Thompson; Sherry Gill, Joey's oldest sister; and, Thelma Hubbard, Joey's older sister.   At the close of the

---

[1]By the time of the hearing, Officer Gwin was a Lee County deputy sheriff.

[2]By the time of the hearing, Coach Miller was head coach at Mississippi Delta Community College in Moorhead.

plaintiff's case-in-chief, the defendants offered a motion for a directed verdict, and the trial judge granted a directed verdict as to Gregory, but denied the motion as to the Lee County School District (Lee County). In the defendant's case-in-chief, Gregory and Dr. David E. Stewart, a certified rehabilitation counselor, testified. The plaintiff offered no rebuttal.[3] Lee County again requested a judgment of dismissal based on the alleged failure of the plaintiff to make out a prima facie case on the issue of liability, or alternatively, that the trial court find Joey to have been contributorily negligent. After a recess in order to consider the evidence, Judge Gardner heard arguments from counsel and immediately thereafter issued his bench ruling as follows:

> Motion for a directed verdict in favor of the defendant will be overruled.
>
> While I don't feel obligated to do so, I think it's appropriate that I discuss somewhat my findings and conclusions in resolving this matter.
>
> The testimony, the only testimony before this Court is to the effect that Mr. Gregory stopped at the stop sign, that he watched a vehicle turning left near him right by -- almost beside him. I guess I understood it was a little north of the intersection itself. That when that vehicle had cleared, he looked back to the right, which would have been to the south and in the direction from which the plaintiff was coming. He did not see the vehicle. As a matter of fact, he said in direct response to someone's question, the first time he saw the car was when he got out of the bus, which would have been after the accident occurred.
> Now, in considering where the area of impact took place, I think it is equally clear, no contradiction whatsoever that it occurred in the northbound lane occupied by the plaintiff in this case or by Joey Thompson.
>
> Based on the only testimony concerning what parts of the vehicles came into contact, it seems apparent to me that the bus was hit by the automobile

---

[3]Also received into evidence during the course of the bench trial were the depositions of Dr. Richard Sharp and Dr. Thomas Boll, as well as the Mississippi Uniform Accident Report form completed by Officer Gwin, photographs of the accident scene, and Joey's medical records and bills.

4

apparently in a fairly head-on circumstance, that is, the car was travelling straight in a northerly direction, striking the bus behind or in the vicinity behind the passenger door located on the right-hand side of the bus somewhat behind the driver's seat, knocking the driver with apparent substantial force from his seat into the doorway breaking glass out, which indicates to me substantial impact, which as it applies to this case would indicate to me that the plaintiff, Joey Thompson, was travelling at an increased rate.

I do not know, but there is testimony or an indication that the speed limit there was 45 miles an hour. I do not know whether the speed exceeded 45, but it was a substantial impact and, no doubt, caused pretty substantial injury to the vehicles, as well as to both of the drivers.

The front of the bus itself was based on the drawing which is a part of the police report in this case which is probably conservative, by the way, because it would appear to me that in all likelihood the bus was at least as indicated in that drawing and possibly slightly more for the impact to have been in the northbound lane of traffic.

In any event, all of these things considered, the Court is certainly of the opinion that the defendant -- I'm sorry, the plaintiff in this case, Joseph Thompson, was contributorily negligent in causing the accident.

Having said that, the Court is of the opinion that judgment should be entered on the Complaint filed in this cause for the plaintiff, Nancy Thompson or Joseph Thompson, he is 24 years of age now. There has not been any conservatorship set up or anything in that nature.

***********

The Court is of the opinion that judgment be entered for the plaintiff in this case in the sum of $100,000.

On October 9, 2003, Judge Gardner entered a final judgment consistent with his bench ruling.

This final judgment stated, inter alia:

IT IS ORDERED AND ADJUDGED that George Gregory be dismissed from this action as a named defendant pursuant to the Tort Claims Act.

5

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiff is entitled to a judgement (sic) of and from the Defendant, Lee County School District, and the Court does assess Plaintiff's total damages to be $200,000, and does further find that Plaintiff's actions constituted comparative negligence, and that Plaintiff's total damages should be reduced by that portion of his own negligence, which the Court finds to be 50 per cent, and therefore the Court awards a total judgment in favor of Plaintiff of and from the Defendant, Lee County School District, in the amount of $100,000.00, for which execution may issue according to law.

¶4. It is from this final judgment that Joey has appealed, claiming the trial court committed reversible error in (1) finding him to be contributorily negligent and, (2) awarding damages of only $200,000. We assigned this case to the Court of Appeals. *See* Miss. Code Ann. § 9-4-3(1) (Rev. 2002).

## PROCEEDINGS IN THE COURT OF APPEALS

¶5. The Court of Appeals, relying on its decision in *City of Newton v. Lofton*, 840 So.2d 833, 837 (Miss. Ct. App. 2003), stated, inter alia: "[t]he assignment of contributory negligence in the case *sub judice* was based entirely upon certain inferences drawn by the trial judge from facts in the case; thus, we will examine these inferences in light of the evidence in the record." *Thompson*, 2005 WL 895026 at *2, ¶ 10. The Court of Appeals found the trial court's finding of contributory negligence was "belied by the record." *Id.* at *3, ¶ 11. On the issue of the trial judge's award of damages, the Court of Appeals stated:

> In the case *sub judice,* we find that the trial judge's award of damages was inadequate, as it was not based upon substantial and credible evidence. It is undisputed that (1) Thompson now suffers from permanent cognitive defects, such as loss of language skill, mild dysnomia, reduced motor functioning and coordination, abnormally reduced attentional skills, mental slowness and inefficiency in learning, and visual perceptual difficulties; (2) Thompson's potential earning capacity has been reduced due to these various, permanent

6

cognitive defects; and (3) Thompson has experienced much pain and suffering. There is no indication in the trial court's judgment that these undisputed damages were included in its award.

*Id.* at \*9, ¶ 36.    The Court of Appeals reversed the trial court's finding that Joey was contributorily negligent and rendered judgment as to liability in favor of Joey and against Lee County; and, the Court of Appeals likewise reversed the trial court's award of damages; and remanded the case to the Circuit Court of Lee County for a new trial as to damages only. *Id.* at \*9, ¶ 40.    After the Court of Appeals denied the motion for rehearing, Lee County filed a petition for writ of certiorari, which was granted by this Court.

¶6.    In its cert petition, Lee County asserts that the Court of Appeals's decision in this case conflicts with prior decisions of that Court as well as this Court.    *See* M.R.A.P. 17(a)(1). Specifically, Lee County alleges the Court of Appeals erred failing to consider Miss. Code Ann. Section 63-3-805, and its own analysis of this statute in *Redmond v. Breakfield,* 840 So.2d 828 (Miss. Ct. App. 2003), instead relying on its decision in *City of Newton* and in reversing the trial court's award of damages and remanding this issue for a new trial.    In support, Lee County contends an appellate court is without authority to reverse an award of damages simply on a finding that the trial court award is "inadequate and unreasonably low."

## DISCUSSION

¶7.    In considering whether the trial court erred in its factual findings as to Joey's contributory negligence and as to the award of damages, "[the] circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and

7

his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *City of Jackson v. Perry*, 764 So.2d 373, 376 (Miss. 2000) (citing *Puckett v. Stuckey*, 633 So.2d 978, 982 (Miss. 1993)).

> This Court recognizes that the trial judge, sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses. *Rice Researchers, Inc. v. Hiter,* 512 So.2d 1259, 1265 (Miss. 1987); *Hall v. State ex rel. Waller,* 247 Miss. 896, 903, 157 So.2d 781, 784 (1963). Where there is conflicting evidence, this Court must give great deference to the trial judge's findings. *McElhaney v. City of Horn Lake,* 501 So.2d 401, 403 (Miss. 1987). This Court reviews errors of law, including the proper application of the Mississippi Tort Claims Act, de novo. *City of Jackson v. Perry,* 764 So.2d 373, 376 (Miss. 2000) (citing *Cooper v. Crabb,* 587 So.2d 236, 239 (Miss. 1991)).

*City of Jackson v. Lipsey*, 834 So.2d 687, 691 (Miss. 2003).

## I. WHETHER THE TRIAL COURT ERRED IN FINDING THE PLAINTIFF DRIVER TO BE CONTRIBUTORILY NEGLIGENT.

¶8. Joey asserted, and the Court of Appeals agreed, that the trial court erred in finding Joey was guilty of contributory negligence. Much of the Court of Appeals' opinion on this issue focused on the trial court's finding that Joey was most likely speeding at the time of the accident. The trial court found, inter alia, that Joey's truck struck the much bigger school bus in a direct hit "behind the passenger door located on the right-hand side of the bus" with such force that Gregory was thrown from the driver's seat, situated on the left side of the school bus, into the door on the right side of the bus, knocking out the glass. Acknowledging he did not know whether Joey was driving in excess of the 45-mile per hour speed limit, the trial judge stated the collision "was a substantial impact and, no doubt, caused pretty substantial

8

injury to the vehicles, as to both of the drivers." The trial court opined that Joey "was traveling at an increased rate." The trial judge also concluded that in reviewing a "probably conservative" drawing on the police report, "it would appear to me that in all likelihood the bus was at least as indicated in that drawing and possibly slightly more for the impact to have been in the northbound lane of traffic."

¶9.     In its review of the trial court's findings of fact as well as the entire record in this case, the Court of Appeals thoroughly explained its reasoning in concluding the trial court erred in finding Joey to have been contributorily negligent in the operation of his truck. *Thompson*, 2005 WL 895026 at ** 2-7, ¶¶ 10-25. The Court of Appeals stated, inter alia: (1) there was no expert testimony as to Joey's speed; (2) Gregory's injuries were relatively minor; (3) the record was devoid of evidence which would indicate a speed of more than 45-miles per hour was required to throw Gregory from the driver's seat into the passenger door; (4) there was no evidence to support the trial court's finding the drawing on the police report was "probably conservative," and that this drawing would support a negative inference that Joey was contributorily negligent; (5) the trial court erroneously found Joey was speeding; and (6) there was insufficient evidence before the trial court to find a "substantial impact" so as to conclude that Joey was speeding.

¶10.    Because we are addressing this issue on certiorari, we feel compelled to quote extensively from the Court of Appeals' opinion in order to fully address this issue:

> Going a step further, however, we find that there is no credible evidence in the record to support a finding that Thompson was in any way at fault. This is because the record shows very simply that the bus pulled out into the right of

way and in front of Thompson. Further, but for the school bus pulling out into the right of way, the accident would not have happened, and it appears from the record that, given the fact that the road had only two lanes, the most that Thompson may have been able to do in any event would have been to swerve off the road in order to avoid the bus. We certainly cannot say that such a result would have been better or worse than what actually transpired. But we can say, based upon what we find in the record, that there is no credible evidence to support the conclusion that Thompson was partially at fault in this accident.

In order to find that Thompson was partially at fault in this accident would require one to accept as proven, as the trial judge did, certain facts that are not supported by credible evidence in the record. That we cannot do.

As Thompson points out for the sake of argument in his brief, given the distances involved, even if Thompson had been traveling as fast as 120 miles per hour, Gregory would have had as many as fifteen seconds of clear, unobstructed viewing time to see Thompson's red truck approaching. Given the fact that no credible evidence in the record supports the conclusion that Thompson was going any speed above the posted limit (much less the clearly hypothetical and hyperbolic 120 miles per hour Thompson uses to prove his point), the court might easily have concluded that Gregory had even more time in which he should reasonably have observed the approach of Thompson's vehicle.

How on a clear day, looking down two unobstructed views of straight lanes of traffic, Gregory succeeded in seeing one vehicle approaching in the southbound lane but failed to see the red truck approaching from the northbound lane, we cannot say. We can say, however, what the answer to this question should not be. Given the evidence in this case, one could not reasonably answer that because Gregory failed to see Thompson's red truck approaching that, therefore, Thompson must have been doing something wrong. If there was evidence of negligence or wrongdoing on the part of Thompson, this case would be different, but such a conclusion is unreasonable, given the facts of this case, as there was no credible evidence of negligence or wrongdoing on the part of Thompson. Unless Thompson was traveling at a literally "blurring" rate of speed (in which case we doubt that Gregory would have left the accident with only minor injuries after the impact) then Gregory should have seen the approaching red truck from the north, just as he saw the other approaching vehicle from the south; and the fact that Gregory failed to see Thompson does not prove that Thompson must have been partially responsible for the accident.

Very simply, the record shows that Gregory pulled out in front of Thompson and caused the collision. There was little or nothing that Thompson could have done to avoid or even minimize the accident. As noted, the road had only two lanes; thus, Thompson had nowhere to go, other than off the road, even if he had anticipated that Gregory would pull out in front of him. Also, given the point of impact *at the front end of the bus,* we do not see how Thompson could have avoided a collision, even if he had been traveling less than the posted speed limit. If Thompson had rear-ended the bus, for example, this case might be different, but, as the facts of this case stand, we do not believe that fault should be assigned to Thompson based upon his failure to take extreme, split-second evasive maneuvers in reaction to or in anticipation of Gregory's negligence.

We find that the trial court's finding of contributory negligence was clearly erroneous, and we find further that the record contains no credible evidence that the accident was caused in any part by Thompson's actions. Therefore, we reverse the trial judge's assignment of fifty percent comparative negligence to Thompson, and render to remove any assignment of comparative negligence to Thompson.

*Id.* at **5-7, ¶¶ 20-25. With all due respect and deference to our learned colleagues on the Court of Appeals, they failed to address, a critical point which was addressed by Lee County before the trial court, in its appellate brief, and in its motion for rehearing filed with the Court of Appeals – the existence of Miss. Code Ann. Section 63-3-805, which states:

The driver of a vehicle shall stop as required by this chapter at the entrance to a through highway and shall yield the right-of-way to other vehicles which have entered the intersection from said through highway or which are approaching so closely on said through highway as to constitute an immediate hazard. However, said driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on said through highway shall yield the right-of-way to the vehicle so proceeding into or across the through highway.

The driver of a vehicle shall likewise stop in obedience to a stop sign as required by this chapter at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed.

11

Although Lee County argues the applicability of this statute in its appellate brief and in its motion for rehearing, a careful reading of the opinion of the Court of Appeals reveals the glaring absence of any discussion of this statute and its applicability vel non.

¶11. Section 63-3-805 appropriately requires the driver of a vehicle approaching an intersection with a through highway and being confronted with a stop sign to stop. Proceeding cautiously, once the driver of the vehicle determines there are no vehicles on the through highway which pose an immediate hazard, that driver may proceed to enter the through highway. The drivers of vehicles traveling on the through highway and approaching the intersection "shall" yield the right-of-way to the vehicle which is proceeding into or across the through highway.

¶12. With Section 63-3-805 in mind, we again turn to the facts of this case as revealed in the record. This accident occurred on a clear day; the roads were dry; and driver visibility (for vehicles both on Romie Hill Road and North Street) was virtually unobstructed due to the clear weather, the road conditions and the terrain in the area of the accident. Joey was driving his 1999 Chevrolet truck in a northerly direction on Romie Hill Road, and Gregory was driving his 1994 International school bus eastbound on North Street in Shannon.[4] Both Joey and Gregory had a clear and unobstructed view of the intersection of Romie Hill Road and North Street as they approached this intersection. Unquestionably, Joey had the right-of-way because he had no stop signs or traffic lights which would require him to stop his vehicle or otherwise

---

[4]Once outside the Shannon city limits, Romie Hill Road becomes Highway 245, and North Street becomes County Road 300. Likewise, according to the testimony of Officer Gwin, Highway 245 was formerly known as Highway 145.

reduce his speed.[5]   On the other hand, Gregory had a stop sign which he was required to honor as he approached Romie Hill Road traveling east on North Street.

¶13.   Gregory, a school teacher at Shannon for thirty years, and a Lee County school bus driver for twenty-seven years, was very familiar with the intersection of Romie Hill Road and North Street.[6]   Gregory testified that he came to a complete stop at the stop sign.   This testimony is  unrebutted in the record because Joey did not testify (and Gregory and Joey were the only eyewitnesses to the accident) and  is corroborated by Officer Gwin's testimony. During direct examination by Joey's attorney, Officer Gwin testified:

> Q.   All right.   Now based upon your discussions with Mr. Gregory [at the accident scene], did Mr. Gregory relay to you whether or not he adhered to or actually stopped at that traffic sign?
> A.  Again, I don't have exact recall of our conversation.
> Q.  Yes, sir.
> A.  Looking again at the accident report –
> Q.  Yes, sir.
> A.   – I'm going to say that that is probably correct, simply because had he told me something different or I had reason to believe that he ran the stop sign, it would have been noted somewhere.   Based on the fact that there is nothing there about anybody running the stop sign or disregard for a traffic device, I'm going to say that that is correct, that he did stop at the stop sign.

Joey does not contest  that Gregory stopped at the stop sign, but instead focuses on the fact that while Gregory was stopped at the stop sign, his attention had been diverted from looking to his right, where he would have seen Joey's vehicle, because Gregory was looking to his left and observing a southbound vehicle on Romie Hill Road.   According to Gregory, he was

---

[5]Officer Gwin did testify:  "to the best of my memory...there is a 45 mile per hour speed limit at the city limit sign as you are [heading north] into town."

[6]Gregory testified  "I go through that intersection four times each day that I'm driving a school bus."

13

waiting at the stop sign for the southbound vehicle to pass through the intersection, but instead, this vehicle gave a turn signal and turned into a store parking lot prior to entering the intersection; once that vehicle turned, he looked in both directions, determined the road was clear, and proceeded slowly through the intersection. Joey's theory is that Gregory's attention was diverted by the southbound vehicle on Romie Hill Road, that Gregory entered the intersection without looking back to his right to observe Joey's northbound vehicle, and that Gregory's inattention was the sole proximate cause of the accident. Gregory admitted he never saw Joey's vehicle until after the collision. However, Gregory firmly asserted throughout the hearing that he looked both to his right and to his left before entering the intersection stating that after he observed the southbound vehicle turn into the store parking lot, he looked back to the right for northbound traffic, and, observing none, he slowly entered the intersection.

¶14. The Court of Appeals criticized the trial court's use of Officer Gwin's diagram in the accident report, depicting the school bus in Joey's northbound lane of travel when the collision occurred, as a justification to find Joey contributorily negligent. However, we also find in the record, Officer Gwin's testimony during Lee County's cross-examination:

> Q. Now, is it correct, do I understand correctly from the report that Mr. Gregory's bus had crossed the lane for southbound traffic and had actually gotten over into the lane for northbound traffic when the impact occurred?
> A. Looking at the report, I would say that's correct.
> Q. All right, sir. Because Mr. Thompson was going north.
> A. Yes, sir, that's correct.
> Q. Now, Mr. Herring asked you if there was anything to obscure a driver's vision there travelling east on County Road 300, and I believe you indicated that there was not.

14

A. Yes, sir, that's correct.

Q. Likewise, it would be correct, would it not, that there was nothing to obscure the vision of a driver who was driving north on Romie Hill or 145?

A. That is also correct, sir.

************

Q. Mr. Gwin, I'm going to show you what have been premarked these photograph exhibits, and they are listed on the back there, 1, 2, 3, and 4.

A. Okay.

Q. Can you identify those?

A. Okay. This appears to be -- at this point would be Highway 245 which is actually Romie Hill, the road we're talking about once it goes into the city limits.

Q. I have been saying 145. Is it 145 or --

A. It's 245 now. It used to be 145.

Q. All right, sir. I stand corrected.

A. Yes, sir, that's what it appears to be.

Q. All right, sir. All four of them, then, are photographs looking north on Highway 245?

A. Yes, sir, that is correct.

Q. This would have been the view that Mr. Thompson would have had as he traveled north.

A. Yes, sir, that is correct.

Q. All right, sir. All right. Now I'm going to ask you to look at what's been marked as 5 through 10 and see if you can identify those.

A. Okay. Okay. This one appears to be the same roadway heading the opposite direction.

Q. All right, sir.

A. Would be heading south on 245 at the intersection that's in question here.

Q. All right, sir.

A. Yes, sir, that's what it appears to be.

Q. All right, sir. So then 5 through 10 are a view of looking back down Highway 245 south.

A. Yes, sir.[7]

---

[7]Earlier in the cross-examination of Officer Gwin, Lee County's counsel questioned Gwin about his direct examination testimony that his failure to note in the accident report that Gregory ran the stop sign indicated that Gregory did not run the stop sign. On redirect examination, Joey's counsel attempted to elicit from Gwin that he had noted in the accident report that Gregory "pulled into intersection failing to yield right of way" to Joey. The trial court correctly sustained Lee County's objection to this testimony. While Gwin could testify as he did regarding the position of the school bus on the highway when he arrived at the accident scene, his testimony that Gregory failed to yield the right of way would not be proper, even though Joey

15

As we view this testimony and the totality of the record before us, there was legally sufficient evidence for the trial judge to conclude the collision occurred in Joey's lane of travel. This evidence would certainly go to the issue of whether Joey was contributorily negligent.

¶15. Officer Gwin readily admitted that, from his personal viewing of the accident scene and the photographs of the scene received into evidence at the trial, there was nothing on North Street or Romie Hill Road to obscure the vision of Gregory or Joey as they approached the intersection. There was similar testimony from Gregory. Additionally, we note Gregory's testimony during Lee County's case-in-chief:

> Q. All right. Now, George, how much -- well, let me ask you this: When you've got that school bus at a complete stop at a stop sign, can you dart through that intersection like you can with a car?
> A. No, sir. They don't take off that fast, sir.
> Q. How fast do you estimate top speed that you were going when you got hit?
> A. I would say five, maybe a little bit more than that, six, seven miles an hour. It wasn't very fast.

¶16. In addition to the evidence and the law, Joey argued to the trial court, the Court of Appeals, and now us, that familiar rules of the road computations would support his theory that if Gregory had only been attentive to the existence of northbound traffic on Romie Hill Road, the accident would never have occurred. In his appellant's brief, Joey states:

> Later Mr. Gregory admits that he could see "[p]robably half a mile or close to it" looking down Romie Hill road in the direction from which Joey was traveling. [Gregory, T.p103 lines 20 - 24] Applying simply arithmetic to the

offered this evidence on redirect examination in an effort to overcome Gwin's testimony that there was no indication Gregory ran the stop sign. *See* **Roberts v. Grafe Auto Co.**, 701 So.2d 1093, 1098-99 (Miss. 1997) This was not proper redirect because this testimony was initially elicited from Gwin during his direct examination by Joey's counsel, and because the phrases "failing to yield the right of way" and "running a stop sign" are not synonymous.

16

facts elicited from Mr. Gregory's testimony alone reveals (1) the lack of credibility in his testimony that he looked in the direction of Joey before proceeding into the highway and (2) the lack of plausibility in the School District's theory that Joey Thompson was at fault in the accident.

Officer Gwin testified that he believed the speed limit to be 45 miles per hour at the location where Joey was traveling. [Gwin, T.p24 lines 4 - 17] Even assuming Joey was traveling at sixty miles per hour, or fifteen miles per hour over the speed limit (to which no proof was offered), Mr. Gregory would have been able to observe Joey vehicle traveling the nearly half-mile for thirty (30) seconds prior to impact.[8] If Joey was traveling as fast as eighty (80) miles per hour, Mr. Gregory would still have had more than twenty-two (22) seconds within which he would have been able to observe Joey's vehicle. [9] Without being factitious, even if Joey Thompson had been traveling at 120 miles per hour, Mr. Gregory would still have had fifteen (15) seconds to observe Joey's vehicle.[10]

Using this simple arithmetic, it becomes clear that it is contrary to all logic to believe Mr. Gregory could actually have looked down Romie Hill road and not have seen Joey Thompson's vehicle. It could not have happened like Mr. Gregory said. If he did look in Joey's direction, he had more than sufficient time to observe him and if he did not, it is certainly not Joey's fault. The proof at trial simply does not support the School District's argument, nor the apportionment of fault by the trial court.

The only testimony whatsoever offered by George Gregory which could arguably be said to support a finding that Joey was partially at fault is Mr. Gregory's testimony that he had crossed the southbound lane of Romie Hill prior to Joey's vehicle making impact. [Gregory, T.p101 lines 9 - 12] In other words, that Mr. Gregory had already gotten across one lane of the highway

---

[8]A vehicle traveling at 60 miles per hour travels 316,800 feet per hour (60 x 5280 = 316,800), or 5,280 feet per minute (316,800 / 60 = 5,280), or 88 feet per second (5,280 / 60 = 88). One half mile is 2,640 feet. Thus, traveling at 60 mph, a vehicle travels the 2,640 in 30 seconds. (2,640 / 88 = 30).

[9]A vehicle traveling at 80 miles per hour travels 422,400 feet per hour (80 x 5280 = 422,400), or 7,040 feet per minute (422,400 / 60 = 7,040), or 117.33 feet per second (7,040 / 60 = 117.33). One half mile is 2,640 feet. Thus, traveling at 80 mph, a vehicle travels the 2,640 in 22.5 seconds (2,640 / 117.33 = 22.5).

[10]A vehicle traveling at 120 miles per hour travels 633,600 feet per hour (120 x 5280 = 633,600), or 10,560 feet per minute (633,600 / 60 = 10,560), or 176 feet per second (10,560 / 60 = 176). One half mile is 2,640 feet. Thus, traveling at 120 mph, a vehicle travels the 2,640 in 15 seconds. (2,640 / 176 = 15).

before the accident. Mr. Gregory suggests that he was going per haps "six, seven miles an hour" at the time of impact. [Gregory, T.p101 line 13].

Taking Mr. Gregory's testimony to be true and again applying a little simple math, the bus he was operating would have been traveling at 10.3 feet per second just prior to impact.[11] Since a standard lane of a two-lane highway is approximately thirteen (13) feet wide, Mr. Gregory would have entered Joey's path of travel in just over one second. The School District's arguments that Joey was at fault in causing this accident as a result of his failure to observe Mr. Gregory's movement and avoid the accident all within the one second period of time is without merit. While the School District argues that Joey Thompson was partially at fault, it does not explain or offer any theory as to what Joey should have done to avoid the accident.

It is unclear from the bench ruling whether the trial court found Joey to have exceeded the lawful rate of speed. The court stated: "which as it applies to this case would indicate to me that the plaintiff, Joey Thompson, was traveling at an increased rate." [Judge Gardner, T.p125 line 28 - p126 line 2] However, the court goes on to state: "I do not know whether the speed exceeded 45 . . ." [Judge Gardner, T.p126 lines 5 - 6] Certainly there was no credible proof offered to establish that Joey Thompson was speeding. Nevertheless, assuming for the moment that the trial court found that Joey was exceeding the posted speed limit, that still does not necessarily conclude that he was at fault in the accident. As explained above, Mr. Gregory still had more than sufficient time to observe and yield to Joey's vehicle, even assuming Joey to have been speeding.

Surely the law does not require that Joey Thompson, while traveling down a clear highway in broad daylight should having anticipated that a school bus stopped at a stop sign would have pulled out into his lane of travel. Even if Joey would have observed the bus for the one second of time it took to cross the south-bound lane, Joey still had insufficient time to do anything to avoid the accident. As set forth above, using Mr. Gregory's own estimates of speed, he most likely was into Joey's path of travel within just over one second. If Joey is traveling at 45 miles per hour, or even 60 miles per hour, what could he have done to avoid an accident given less than two seconds of warning? The School District offers no theories or conclusions. Rather, it simply throws up an

_____

[11]By simple arithmetic, Mr. Gregory was traveling 10.3 feet per second just prior to impact if he was traveling 7 miles per hour. There are 5,280 feet per mile, and traveling at 7 miles per hour, one travels 36,960 per hour. At this rate of speed, one travels 616 feet per minute, or 10.3 per second.

argument of comparative negligence, and unfortunately, the trial court agreed despite a total lack of any evidence to support the argument.[12]

¶17.    While we agree with most of Joey's calculations, we cannot agree with his deductive reasoning based on his calculations in footnote 14.  Joey concludes that since "a standard lane of a two-lane highway is approximately thirteen (13) feet wide," and since Gregory's school bus could travel 10.3 feet per second traveling at the rate of 7 miles per hour, Joey would have had just over a second to react before the school bus entered his lane of travel (13 feet divided by 10.3 feet equals 1.26 seconds).  However, in arriving at his conclusion, Joey would have to assume Gregory did not stop at the stop sign, and that Gregory indeed ran the stop sign traveling at the rate of 7 miles per hour.  This assumption is belied by the record.  That Gregory came to a complete stop at the stop sign on North Street before entering Romie Hill Road is unrebutted in the record.  The only other  premise on which Joey could conclude that Gregory's school bus traveled from the stop sign to his northbound lane of travel in "just over one second" would be that the laws of physics allow a school bus to go from zero miles per hour to seven miles per hour, instantaneously.  We find this to be an impossibility.  Additionally, Gregory's unrebutted testimony was that  at the time of the collision, he was traveling at the rate of "five, maybe a little bit more than that, six, seven miles an hour."  As Gregory also testified, a school bus cannot "dart through" an intersection from a dead stop as compared to a car.  In referring to school buses in general, Gregory testified that "[t]hey don't take off that fast."

---

[12]Footnotes 8-11, inclusive, supra, appear as footnotes 1-4, inclusive, in the appellant's brief.

¶18.    We agree with Lee County that today's case is factually similar to a recent case decided by the Court of Appeals, ***Redmond v. Breakfield***, 840 So.2d 828 (Miss. Ct. App. 2003), but not cited by that court in its opinion. In ***Redmond***, Breakfield, traveling east on Highway 35 in Covington County, approached a stop sign at the intersection of Highway 35 and Highway 49. He intended to negotiate the stop sign and the crossing of Highway 49, and then continue on his way. Redmond was traveling north on Highway 49, which was the through highway. The collision occurred after Breakfield had entered the intersection. Redmond and Breakfield were the only eyewitnesses to the accident. At trial, Breakfield testified that he came to a complete stop at the stop sign, looked for any approaching traffic on Highway 49, and seeing none, he entered the intersection. ***Id.*** at 830. According to the Court of Appeals, "[t]here was testimony tending to show that Redmond had not applied his brakes before striking Breakfield's truck." ***Id.*** The jury returned a verdict in favor of Breakfield, and Redmond appealed.

¶19.    Relying on Miss. Code Ann. Section 63-3-805, the Court of Appeals stated:

> Redmond, in support of his contention that the verdict was against the weight of the evidence, seems to contend that the uncontradicted proof that he was traveling on the through highway at the time of the accident necessarily establishes Breakfield's negligence for the accident. We find this to be an incorrect analysis of the law and the facts. There is contradictory evidence in the record as to whether Redmond, while traveling on the through highway, had approached so close to the intersection that he constituted an immediate hazard to Breakfield. Breakfield claimed that he stopped and made the necessary observations before entering the intersection. The clear implication of Breakfield's testimony is that Redmond was traveling at a high rate of speed that caused him to enter the intersection and strike Breakfield's truck and that Breakfield had entered the intersection only after he determined that no

20

approaching vehicle posed an immediate hazard. Thus, it was Redmond's failure to approach the intersection with the necessary caution (including, necessarily, at a diminished rate of speed) to observe vehicles--such as Breakfield's--already in the process of crossing over the through highway.

Certainly, Redmond's version of events differed from Breakfield's. However, Breakfield's testimony was not substantially impeached, nor was it shown that any of the uncontradicted physical evidence rendered his version of events unlikely or implausible. In such a circumstance, in the face of differing versions of the facts presented by competing parties to the litigation, it is the duty of the jury sitting as finders of fact to assess the credibility of the witnesses and determine what weight and worth to give any particular element of the evidence. *Upchurch ex rel. Upchurch v. Rotenberry*, 761 So.2d 199 (¶ 22) Miss. 2000).

*Id.* at 831.

¶20.    The facts in this case more strongly undergird the trial judge's finding of negligence on the part of Joey, than do the facts which supported the jury's finding in favor of the defendant driver in *Redmond*. In *Redmond*, both drivers involved in the accident testified, creating clearly conflicting evidence on the issue of negligence; whereas, in our case today, only one driver, Gregory, testified. As in *Redmond*, the trier-of-fact, the trial judge, had to consider the testimony of the witnesses and the exhibits received into evidence, and determine the issues of negligence and proximate causation, including whether Joey was contributorily negligent. Miss. Code Ann. Section 11-7-15 states:

In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property.

21

*See* ***Tharpe v. Bunge Corp.***, 641 So.2d 20 (Miss. 1994); ***McDaniel v. Ritter***, 556 So.2d 303 (Miss. 1989). In reading the record, including the trial judge's findings of fact, we conclude the trial judge properly considered all the evidence before him in reaching his conclusion that Joey was contributorily negligent. It matters not what this Court may have done if placed in the trial court's fact-finding role. It matters only that in exercising our mandated appellate review, we can confidently determine the trial court's findings of fact "are supported by substantial, credible, and reasonable evidence." ***Perry***, 764 So.2d at 376. We find that they are. Gregory testified he came to a complete stop at the stop sign on North Street. This fact was corroborated by the testimony of Officer Gwin. Gregory testified that he looked both ways for oncoming traffic on Romie Hill Road before entering the intersection, and saw no oncoming northbound traffic on Romie Hill Road. Upon deciding to enter the intersection, Gregory had to start his school bus from a dead stop and he was traveling between five to seven miles per hour at the time of the collision, which occurred in Joey's lane of travel. In referring to the photographs of the accident scene, both Gregory and Gwin testified that not only Gregory, but also Joey, had a clear unobstructed view of the intersection as they approached the intersection from their respective directions. The trial judge found that Gregory's school bus was hit by Joey's truck "apparently in a fairly head-on circumstance," thus indicating a lack of evasive action on the part of Joey.

¶21. If a person is adhering to the statutory mandate of Section 63-3-805 when operating a motor vehicle on the roads and highways of this state, that person is engaging in an exercise of common sense. Just because a person may be driving on a through highway with the lawful

22

right-of-way to proceed through an intersection with another road where there are located stop signs, does not mean that person may approach and enter the intersection with impunity and without exercising caution. The trial judge in today's case had to make such determinations from the record as to (1) whether any vehicles traveling on Romie Hill Road constituted an immediate hazard at the time Gregory entered the intersection; (2) whether Gregory proceeded cautiously through the intersection; and, (3) whether Joey was under a statutory duty to yield the right-of-way to Gregory after Gregory entered the intersection.

¶22. All of this having been said, we find the trial court's finding of contributory negligence on the part of Joey is not manifestly wrong and is supported by substantial and credible evidence. Thus, in appropriately affording deference to the trial judge's findings of fact on this issue, we find this assignment of error to be without merit.

## II. WHETHER THE TRIAL COURT ERRED IN ASSESSING THE DAMAGES.

¶23. Joey asserts the trial court's assessment of his total damages of $200,000 is "unconscionably insufficient and inadequate." In making this assertion, Joey readily acknowledges that in order to succeed on this issue, he is confronted with "a very high burden indeed." We agree. This Court has stated:

> In *Lewis v. Hiatt,* 683 So.2d 937, 941 (Miss.1996), this Court reasoned that "[i]t is primarily the province of the jury [and in a bench trial the judge] to determine the amount of damages to be awarded and the award will normally not be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.'" *Id.* (quoting *Harvey v. Wall,* 649 So.2d 184, 187 (Miss.1995)).

*Foster v. Noel,* 715 So.2d 174, 183 (Miss. 1998). We are mindful that Joey suffered serious injuries as a result of this accident and incurred over $50,000 in medical expenses. Joey's mother and two sisters testified to Joey's injuries, and the impact these injuries have had on Joey and his daily life.[13] Coach Miller testified to his observations of Joey, both on and off the football field, before and after Joey was injured in this accident. The trial court also had before it the depositions of Dr. Richard Sharp and Dr. Thomas Boll. Joey's mother and two sisters, and Coach Miller, were also subjected to cross-examination by Lee County's counsel.

¶24. The trial judge was charged with the responsibility of hearing and considering the testimony of the witnesses and observing their demeanor. Regardless of the number of judges who have considered this case on appeal, Judge Gardner is the only member of the judiciary who will ever have the benefit of not only hearing the testimony, but also observing the demeanor of the witnesses as they testified. At least part of what Judge Gardner heard and observed was Lee County's cross-examination of Nancy Thompson, Joey's mother. This is but a portion of her testimony on cross examination:

> Q.  Ms. Thompson, when Dr. Sharp and Dr. Cannella discharged Joey from the hospital on December the 31st, 1998, was he able to bathe himself, feed himself, dress himself, do all the things that we call activities of daily living?
> A.  No, he wasn't.
> Q.  He wasn't?
> A.  No, he wasn't.
> Q.  Have you read Dr. Sharp's deposition? They have asked you about these depositions. Have you read his deposition?

---

[13]At the time of the hearing, one of Joey's sisters, Thelma Hubbard, was a certified mental health therapist with the Region I Mental Health Center in Charleston, Mississippi. She saw Joey every other weekend when she traveled to Shannon for family visits.

24

A. No, I didn't read Dr. Sharp's deposition.

Q. He states here on page 16, At discharge, he was independent in all activities of daily living and mobility. Now, why do you think Dr. Sharp would say that if he wasn't?

A. I really don't know, because he wasn't.

Q. Don't know. Okay. So Dr. Sharp was just wrong about that?

A. Yes, sir.

Q. Okay. This is his primary physician that has treated him now for some 27 days, and he says he can do everything that's needed to be done to take care of himself, but he's wrong?

A. Yes, sir, because we worked with him daily.

Q. Okay. Now, what was his speech like when Dr. Sharp and Dr. Cannella discharged him?

A. Well, it was blurry. It was as if his tongue was thick.

Q. Well --

A. And he couldn't deliver his speech too good.

Q. Have you read Dr. Sharp's deposition about that?

A. No, I haven't.

Q. Are you aware of the fact that he says that he didn't -- he doesn't recall that he had any speech problem at the time of discharge? This is on page 17 and 18 of his deposition.

A. No, he did have a speech problem.

Q. So Dr. Sharp got that wrong, too?

A. Yes, sir, he have (sic).

Q. Okay. Now, you went back with him in January to see Dr. Cannella, didn't you, the two of you went together?

A. Yes.

Q. Did you recall Dr. Cannella telling you and putting down in his records that his memory and mental status had improved?

A. No.

Q. You don't recall that?

A. No.

Q. Do you recall Dr. Cannella saying that neither you nor Joey had any specific problems or complaints?

A. No.

Q. Was Dr. Cannella wrong about that?

A. Yes.

Q. Okay. Now, do you remember -- do you remember going back in February with Joey to see Dr. Cannella?

A. Yes, I do.

Q. Do you recall him saying then that Joey's speech and memory were normal?

25

A. No, I don't.

Q. Okay. Do you recall him saying that his mental status was normal?

A. No, I don't.

Q. Do you recall him saying that Joey continued to make an excellent recovery?

A. Yes.

Q. He did say that?

A. Yes.

Q. Okay. But what about his speech and memory? Was it normal at that time?

A. No, it wasn't.

Q. So Dr. Cannella is wrong about that?

A. Yes.

Q. What about -- he said his mental status was normal; is that correct?

A. No, it's not correct.

Q. So Dr. Cannella was wrong about that, too?

A. Yes.

************

Q. Didn't the doctor, Dr. Cannella, release him to go back and play football?

A. Yes, he did.

Q. All right. Was Dr. Cannella wrong about that?

A. In my opinion.

************

Q. Now, every time you went to see Dr. Cannella, didn't he tell you at each one of these visits that if you felt like you had any problem to call him back?

A. No, he never said that.

Q. He never said that either. So if he has got that in his records that he said that, he's wrong about that, too?

A. Yes.

¶25.    Finally, in mitigation of damages, Lee County also offered the testimony of David E. Stewart, a self-employed certified life care planner and rehabilitation counselor; therefore, Judge Gardner had this evidence to consider.

¶26.    That Joey was seriously injured is not in dispute – the extent of his injuries and his recovery is disputed. As the fact-finder in the bench trial, Judge Gardner was presented with a "classic jury case" based on conflicting testimony regarding the extent of Joey's injuries and

26

the extent of his recovery. One well-established principle cannot be ignored by us. It matters not what this Court may have done if w, as the original fact-finder, were able to arrive at the dollar-value of Joey's damages. Rather, based on our mandated appellate review, we must determine based on the totality of the record before us, whether the trial judge's assessment of damages was so unreasonably low and outrageous that his judgment must be reversed and the case remanded for a new trial as to damages. We are constrained, as a matter of well-established law, to answer this question in the negative, and to affirm the trial court's total damage award in the amount of $200,000.[14]

¶27. For these reasons, we find this assignment of error to be without merit.

## CONCLUSION

¶28. For the reasons stated, we find the Court of Appeals erred in reversing the trial court's finding of contributory negligence by Joey, and rendering judgment for Joey on the issue of negligence. We further find the Court of Appeals erred in reversing the trial court's

---

[14]Justice Randolph, in his dissent, finds fault with the trial judge's failure to explain his calculations in arriving at his total award of damages (Randolph, J., Dissenting Opinion, **9-11). In essence, Judge Gardner rendered a "general verdict" similar to jury verdicts which we routinely review without the benefit of an explanation from the jury as to how it arrived at the total amount of damages. The failure of the trial judge in this case to give an itemization of the elements of damages does not vitiate his "general verdict." So that there can be no misunderstanding, we have not overlooked our recent decision in *Capital One Services, Inc. v. Rawls*, 904 So.2d 1010 (Miss. 2004). In *Rawls*, we were confronted with a trial judge's award of damages without an evidentiary hearing on damages after grant of a default judgment as to liability. *Id.* at 1013. While we upheld the trial court's refusal to set aside the default judgment, we remanded the case with directions to conduct an evidentiary (on-the-record) hearing on the issue of damages. *Id.* at 1017-19. However, in today's case, Judge Gardner conducted an on-the-record hearing as to liability and damages – he simply did not itemize his award of damages.

assessment of damages in the total amount of $200,000 and remanding this case to the trial court for a new trial as to damages.

¶29.    Accordingly, we reverse the judgment of the Court of Appeals and reinstate and affirm the judgment of the Lee County Circuit Court.

¶30.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED.**

    **SMITH, C.J., WALLER, P.J., EASLEY AND DICKINSON, JJ., CONCUR. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COBB, P.J., AND GRAVES, J.  DIAZ, J., NOT PARTICIPATING.**

    **RANDOLPH, JUSTICE, DISSENTING:**

¶31.    The Lee County Circuit Court assigned contributory negligence to Thompson despite an absence of "substantial, credible, and reasonable evidence," *City of Jackson v. Perry*, 764 So. 2d 373, 376 (Miss. 2000) (citing *Puckett v. Stuckey*, 633 So. 2d 978, 982 (Miss. 1993)), to support that conclusion.  Moreover, the damages awarded to Thompson were unreasonably low so as to shock the conscience of this Justice, taking into account the magnitude of injuries sustained by Thompson as the result of an accident for which no proof exists in the record that he was responsible.  Therefore, to the extent the majority's opinion affirms the judgment of the circuit court, I must dissent.

¶32.    In accord with the unanimous decision of the Court of Appeals, the trial court's assignment of contributory negligence to Thompson should be reversed, and judgment should be rendered in favor of Thompson and against Lee County on the issue of negligence.

28

Furthermore, the trial court's inadequate and unreasonable award of damages should be reversed and remanded to the trial court for a new trial on the issue of damages.

### I.      Whether the trial court erred in finding the Plaintiff driver to be contributorily negligent.

¶33.    The majority opinion properly states that, "'[a] circuit court judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor,' and his findings are safe on appeal where they are supported by *substantial*, *credible*, *and reasonable evidence*." ***Id.*** (emphasis added).    Based upon the evidence presented, the trial judge determined in his findings and conclusions that Mr. Gregory stopped the bus at the stop sign on County Road 300; looked to his left and right; did not observe a vehicle coming from the right (the south); proceeded across Romie Hill Road; and the collision occurred in the northbound lane of traffic.    From those findings, and the trial court's unsubstantiated inferences on the manner in which the vehicles came in contact,[15] the trial judge concluded that "plaintiff, Joey Thompson, was traveling at an increased rate."    This conclusion was reached

---

[15]The trial court made these inferences despite the absence of any testimony from an accident reconstruction expert on the subject.  As the Court of Appeals stated:

> we find in the record no justification for the conclusion that the drawing from the police report [a diagram of the accident] was 'probably conservative' and should, therefore, have been taken to indicate something more than the drawing actually indicated. ... This drawing is not a 'realistic' depiction of the accident, and given the nature of this drawing as such, it should not have been taken to convey a picture of the accident sufficient to support the kind of negative inference drawn by the trial court ... .

***Thompson v. Lee County School District***, – So. 2d. –, 2005 WL 895026 at * 4 (Miss. Ct. App. 2005).

29

despite the trial judge's own acknowledgment that no facts supported the finding that Thompson was speeding.[16] From those dubitable conclusions, the trial court determined Thompson was equally contributorily negligent for the accident.[17]

¶34. The majority opinion references Miss. Code Ann. Section 63-3-805 in defending the final judgment of the trial court. Miss. Code Ann. Section 63-3-805 states:

> The driver of a vehicle shall *stop* as required by this chapter *at the entrance to a through highway* and shall *yield the right-of-way* to other vehicles which have entered the intersection from said highway *or* which are *approaching so closely* on said through highway *as to constitute an immediate hazard*. However, said driver *having so yielded* may proceed and the drivers of all other vehicles approaching the intersection on said through highway shall yield the right-of-way to the vehicle so proceeding into or across the through highway.
>
> The driver of a vehicle shall likewise stop in obedience to a stop sign as required by this chapter at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway and shall *proceed cautiously*, *yielding to* vehicles not so obliged to stop which are within the intersection *or approaching so closely as to constitute an immediate hazard*, but may then proceed.

(Emphasis added). Assuming Gregory did come to a complete stop at the stop sign on County Road 300, he still had the duty not to enter the intersection without a proper lookout. To "proceed cautiously" naturally involves maintaining a proper lookout, as well as yielding to

---

[16]The trial judge stated: "I do not know whether the speed exceeded 45 [miles per hour], but it was a substantial impact and, no doubt, caused pretty substantial injury to the vehicles, as well as to both of the drivers." Furthermore, Gregory himself made no statements regarding Thompson's speed at the time of the accident, but rather testified that he did not see Thompson's vehicle until after the accident. As the Court of Appeals concluded: "there was no credible evidence in the record to suggest that Thompson was speeding; therefore, this inference is unreasonable, as it finds no evidentiary support in the record." **Thompson**, 2005 WL 895026 at * 3. For instance, no evidence was presented indicating that an accident at 45 miles per hour or less could not have resulted in this "substantial impact."

[17]Defendants did not plead comparative/contributory negligence as an affirmative defense in responding to Thompson's Complaint.

those vehicles which are "approaching so closely as to constitute an immediate hazard." Miss. Code Ann. Section 63-3-805. That the accident occurred more than suggests Thompson's truck posed an "immediate hazard." *Id.* Moreover, Gregory admitted he had no idea why he never saw Thompson's truck approaching. The clear and obvious inference is that he failed to "proceed cautiously," by failing to maintain a proper lookout. *See Shideler v. Taylor*, 292 So. 2d 155 (Miss. 1974) (automobile driver has a duty to see that which is in plain view, open and apparent; to take notice of obvious danger; and to be on alert so as to avoid collision with objects, vehicles, and others using highway); *Campbell v. Schmidt*, 195 So. 2d 87 (Miss. 1967) (a motorist is charged with seeing what he should have seen); *Tippit v. Hunter*, 205 So. 2d 267 (Miss. 1967) (automobile driver is chargeable with knowledge of all conditions which would be obtainable by the exercise of his faculties, and it is his duty to see that which is in plain view or open and apparent and to take notice of obvious dangers). As a result, he pulled out in front of Thompson's truck, a vehicle which he should have, but failed to, see. Gregory never claimed he believed Thompson's car was far enough away so as not to constitute an "immediate hazard." All he stated was: "I did not see him." The following are uncontested facts: Gregory had an unobstructed view of oncoming traffic from the northbound lane of Romie Hill Road for approximately one-half mile; he was familiar with the intersection;[18] it was a clear day; and Thompson's truck was red. Utilizing calculations commonly accepted in

---

[18]Gregory had been driving school buses in this area for 27 years at the time of the accident. Clearly he understood that the bus accelerated slowly, and that fact should have weighed into any "proceed cautiously" calculation he was making.

31

trial courts, and presented in Appellant's brief, even had Thompson been traveling at 120 miles per hour, Gregory would have had fifteen (15) seconds in which to clearly observe the oncoming vehicle. This distinguishes the case sub judice from *Redmond v. Breakfield*, 840 So. 2d 828, 832 (Miss. Ct. App. 2003), where the Court of Appeals found:

> Breakfield's testimony that Redmond's vehicle was not in sight just moments before the collision would clearly support an inference by the jury that Redmond was only able to cover such a large distance in so short a time by traveling at a hazardously high rate of speed. Additionally, Breakfield made reference to the degree of damage inflicted on his truck as evidence tending to show that Redmond's vehicle must have been traveling at a relatively high rate of speed at impact. We find this evidence of Redmond's possible excessive speed to be enough to support an inference that this was the cause of the collision.

There is no evidence indicating Thompson was traveling over the speed limit of 45 miles per hour. As such, there was an absolute absence of "substantial, credible, and reasonable evidence," *Perry*, 764 So. 2d at 376, Thompson was negligent. Therefore, Gregory's lack of caution in entering the intersection without observing the plaintiff, who was travelling on the primary road, renders the clear result that the right-of-way never transferred to him. The requirement of Miss. Code Ann. Section 63-3-805 for the right-of-way to attach to Gregory was that he proceed with caution and yield to vehicles approaching so closely as to constitute an immediate hazard. That threshold requirement was never met by Gregory based on his sworn testimony.

¶35. Therefore, the Court of Appeals was eminently correct in finding that any contributory negligence apportioned to Thompson by the trial judge was "belie[d] [by] the extremely tenuous evidentiary base upon which the court attempted to ground this ruling ... ." *Thompson*, 2005

32

WL 895026 at * 3. In the absence of any "substantial, credible, and reasonable evidence," *Perry*, 764 So. 2d at 376, that Thompson was negligent, it was utterly improper for the trial judge to impute equal, or any, contributory liability upon Thompson for the accident.[19] To grant that level of deference to the trial judge, as the majority does, is plainly flawed.

¶36.    The majority opines, "[j]ust because a person may be driving on a through highway with the lawful right-of-way to proceed through an intersection with another road where there are located stop signs, does not mean that person may approach and enter the intersection *with impunity and without exercising caution*." Majority Opinion at 23 (emphasis added). This statement is unquestionably true. *See generally, Redmond*, 840 So. 2d at 831. However, the statement implies Thompson "enter[ed] the intersection with impunity and without exercising caution," despite the absence of one iota of supporting evidence in the record. One may only conjure or speculate such a finding, due to Gregory's negligent failure to "proceed cautiously" in the face of an "immediate hazard." The trial court's decision to hold Thompson contributorily negligent for Gregory's mistake, in the absence of any "substantial, credible, and reasonable evidence," *Perry*, 764 So. 2d at 376, was clear error.

II.    **Whether the trial court erred in assessing the total damages suffered by the Plaintiff driver.**

¶37.    The majority opinion sets forth the applicable standard of review for assessing damage awards, stating:

---

[19]Just as the Court of Appeals stated: "to find that Thompson was partially at fault in this accident would require one to accept as proven, as the trial judge did, certain facts that are not supported by credible evidence in the record. That we cannot do." *Thompson*, 2005 WL 895026 at *6.

33

In *Lewis v. Hiatt*, 683 So. 2d 937, 941 (Miss. 1996), this Court reasoned that "[i]t is primarily the province of the jury [and in a bench trial the judge] to determine the amount of damages to be awarded and the award will normally not 'be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.'" *Id.* (quoting *Harvey v. Wall*, 649 So. 2d 184, 187 (Miss. 1995)). *Foster v. Noel*, 715 So. 2d 174, 183 (Miss. 1998).

Majority Opinion at 24. This is a "very high standard of review." *Brandon HMA, Inc. v. Bradshaw*, 809 So. 2d 611, 621 (Miss. 2001). In interpreting that standard, the majority asks: "can we say with confidence that, based on the totality of the record before us, the trial judge's assessment of damages was so unreasonably low and outrageous that his judgment must be reversed and the case remanded for a new trial as to damages." Majority Opinion at 30.

¶38.    As a result of the accident, Thompson incurred approximately $50,000 in medical bills from being hospitalized for twenty-seven (27) days.[20]    Moreover, he sustained permanent cognitive defects from the head injury, including "loss of language skill, mild dysnomia, reduced motor functioning and coordination, abnormally reduced attentional skills, mental slowness and inefficiency in learning, and visual perceptual difficulties." *Thompson*, 2005 WL 895026 at * 1. In addition to the medical treatment he required at the time of the accident, he has since undergone extensive physical and psychological therapy. As a result of his

---

[20]The doctors initial assessment was that Thompson had a fifty percent chance of coming out of the coma he eventually stayed in for three days. Additionally, Thompson spent his first fourteen (14) days hospitalized in the intensive care unit.

34

disabling condition,[21] Thompson's once-promising football career[22] was effectively ended. The report of Dr. Boll indicated that cognitively Thompson had permanently lost significant language, motor function, attention, and mental skills.[23] Sherry Gill, Thompson's older sister and employer, testified Thompson's memory problems following the injury rendered him unable to be left alone during work hours, such that he made a poor employee. Gill further testified that Thompson had become socially withdrawn, frustrated with his troubles in communicating, and prone to crying spells as a result of his frustrations, a marked difference from the outgoing, athletic younger brother she remembered prior to the accident.[24]

¶39.    The Court of Appeals found the trial judge failed to elaborate "on how [he] arrived at this amount of damages or whether this amount included or excluded pain and suffering, future medical expenses, loss of earning capacity, and/or other possible items of damages." *Id.* at * 8. For that reason, the Court of Appeals unanimously "reverse[d] the award of damages as

---

[21]On cross-examination, Dave Stewart, a certified life care planner and rehabilitation counselor, testified that persons who seek vocational rehabilitation usually have a disability or have sustained a disabling condition.

[22]Prior to attending Itawamba Community College ("ICC") on a football scholarship, Thompson had been contacted by Ole Miss, Mississippi State, Arkansas, and Rice University about playing football. At ICC, Thompson started every game as a freshman and his coach, Jay Miller, testified that he had a ninety-nine percent chance to play at the four-year college level. The accident occurred in December following his freshman season. In his sophomore season, Thompson was relegated to playing special teams only. Miller testified that Thompson's reaction times had slowed considerably; that he was slower in answering questions; and that he had a harder time answering questions. In total, Miller stated there was a marked difference in Thompson's speech and motor skills following the accident.

[23]Nancy Thompson, Thompson's mother, testified that, post-accident, her son's memory, money management skills, and grades had diminished significantly.

[24]Thelma Hubbard, Thompson's older sister, testified he had become deeply depressed and told her "he wished he had died" in the accident.

35

inadequate and unreasonably low, and ... remand[ed] this issue to the trial court for a new trial to determine the proper measure of damages, bearing in mind all of the items of damages mentioned in [the] opinion." *Id.* at * 9.

¶40. In affirming the trial court's total damage award of $200,000,[25] the majority opines that the very high burden of an unreasonably low and outrageous damage award was not met here. This finding is based, in part, on the premise that Thompson was contributorily negligent. As that premise is rendered erroneous by the lack of "substantial, credible, and reasonable evidence," *Perry*, 764 So. 2d at 376, that Thompson was at fault, the damage issue should be reconsidered. Thompson incurred a permanently disabling condition as a result of an accident for which he was not responsible. Moreover, to award damages of $200,000 without any apparent consideration, or at least explanation, of whether the award includes pain and suffering, future medical expenses, loss of earning capacity, or other items of damages,[26] necessitates a new trial on the issue of damages. "The determination of damages must be a process which is particular to the facts of the case; there is no fixed rule." *City of Newton v. Lofton*, 840 So. 2d 833, 837 (Miss. Ct. App. 2003). In making that determination, "[t]he trial court takes into account: amount of physical injury, mental and physical pain, present and future pain and disability, temporary and permanent disability, medical expenses, loss of wages and wage earning capacity, sex, age, and health of the injured." *Id.* (citing *Woods v. Nichols*,

---

[25]Only $100,000 went to Thompson because he was deemed 50% contributorily negligent.

[26]Other damages might include loss of enjoyment of life. *See Kansas City Southern Ry. Co., Inc. v. J.C. Johnson*, 798 So. 2d 374, 380-81 (Miss. 2001).

416 So. 2d 659, 671 (Miss. 1982)). In *Scott Prather Trucking, Inc. v. Clay*, 821 So. 2d 819, 822 (Miss. 2002), this Court affirmed a trial court's additur because the jury's award of damages was "contrary to the overwhelming weight of the credible evidence." The jury's award was found to have ignored future medical expenses, permanent impairment and disfigurement, pain and suffering, and loss of enjoyment of life incurred by the injured plaintiff. *Id.*; *see also Rodgers v. Pascagoula Public School Dist.*, 611 So. 2d 942, 945-46 (Miss. 1992) (additur granted for failure of jury to consider plaintiff's pain and suffering); *Pham v. Welter*, 542 So. 2d 884, 889 (Miss. 1989) (additur granted for failure of jury to consider plaintiff's future pain and suffering and permanent partial disability).

¶41.   Thompson, 19 years old at the time of the accident, had his life irreparably altered by the consequences of this accident. His once-promising football abilities were dashed; his cognitive functions are permanently impaired; his employability has become significantly diminished; and he has been cast into a frustrated sense of despair, a shadow of his former vibrant self. To improperly find him contributorily negligent and then award him inadequate damages, with no explanation of the factors contained within that calculation, merits reversing and remanding to the trial court for a new trial on the issue of damages.

## CONCLUSION

¶42.   I agree with the unanimous decision of the Court of Appeals, reversing the trial court's assignment of contributory negligence to Thompson and reversing and remanding to the trial

37

court for a new trial on the issue of damages. Therefore, I respectfully submit my dissent to the majority opinion.

**COBB, P.J., AND GRAVES, J., JOIN THIS OPINION.**