992 So.2d 1220 (2008)
Donna CALLAHAN and Donna Holst, Appellants
v.
Calendar J. LEDBETTER and Lee County School Board, Appellees.
No. 2007-CA-00908-COA.
Court of Appeals of Mississippi.
September 9, 2008.
*1222 Clarence McDonald Leland, Jackson, attorney for appellants.
William C. Murphree, Gary L. Carnathan, Tupelo, attorneys for appellees.
Before KING, C.J., ISHEE and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. This is a negligence action brought by Donna Callahan and Donna Holst originally against Lee County School Board (Lee County) and Calendar Ledbetter. In August 2000, Callahan, her son, and Holst, her mother, were traveling north on the Natchez Trace Parkway (the Trace) on their way to Tupelo. As they neared County Road 261, Callahan noticed a school bus was stopped at the intersection waiting to cross the Trace. The bus pulled out; Callahan was unable to avoid it; and a collision occurred. Callahan and Holst subsequently brought suit against Lee County and the bus driver, Ledbetter.[1] Following a trial in the Circuit Court of Lee County, the trial court ruled in favor of Callahan and Holst, but applied a portion of fault to Callahan. Callahan and Holst now appeal and raise the following issues:
I. WHETHER THE TRIAL COURT ERRED IN APPORTIONING A DEGREE OF FAULT TO CALLAHAN.
II. WHETHER THE TRIAL COURT ERRED IN FINDING CALLAHAN WAS COMPARATIVELY NEGLIGENT.
III. WHETHER THE TRIAL COURT ERRED IN REDUCING HOLST'S RECOVERY BY 35%.
IV. WHETHER THE TRIAL COURT ERRED IN DETERMINING THE AMOUNT OF DAMAGES.
Finding no error, we affirm.

FACTS
¶ 2. On August 7, 2000, Callahan was driving north on the Trace on her way to Tupelo, Mississippi to celebrate her birthday. Holst and one of Callahan's two sons were riding with her. Callahan's brother and other son were riding in another vehicle *1223 in front of Callahan. Because of construction on the Trace, Callahan was forced to briefly detour off the Trace. She testified that once she turned back on the Trace she was driving on the Trace less than a mile before the wreck occurred. As she neared County Road 261 she noticed a school bus pointed in an easterly direction stopped on her left at the intersection. At this point, Callahan eased off the accelerator, but did not apply the brake. As she neared the intersection, Callahan testified that the bus pulled out in front of her when she was approximately two car lengths from the intersection. She stated that all she "could do was slam on [her] brakes." She testified she slid approximately six to ten feet before colliding with the bus. As a result of the accident, Callahan suffered minor injuries. However, her son suffered from a laceration on his head.[2]
¶ 3. Callahan testified that her brother was driving a red truck and was in front of her on their way to Tupelo. According to Callahan, after the accident, Ledbetter said, "I seen [sic] the red truck go by" and "I thought I looked." However, Ledbetter stated in her deposition that she did not see the truck and did not make the statements.
¶ 4. Callahan said that Ledbetter would have had an unobstructed view for one-half of a mile to a mile looking to the south on County Road 261 as the road was straight, flat, and no trees or other obstacles would have provided concealment. Callahan testified that she was not going more than fifty miles per hour, and she estimated Ledbetter's speed at the time of the collision to be approximately five miles per hour.
¶ 5. Ledbetter stated during her deposition that she completed her bus route, but she still had some children on the bus. While she was stopped at the intersection of County Road 261 and the Trace, she was attempting to discover where the remaining children lived. Ledbetter stated that once she was ready to cross the Trace, she looked to her right and left in preparation to move. She explained that there was some construction on the Trace to the south of the intersection, so part of the Trace was closed and there was no traffic coming from the south. Once the traffic from the north of the intersection cleared, she pulled out into the intersection, and the accident-at-issue resulted. She estimated that it took her two seconds to arrive at the point of collision from the time she was stopped to the time of the accident. Ledbetter stated that the first time she saw Callahan's car, she had just pulled into the intersection, and the car was only twenty-five to thirty feet from the bus. At the point of collision, the bus's door had crossed the center line of the Trace, and Callahan's vehicle struck the bus just behind the door.
¶ 6. Ledbetter stated that upon seeing Callahan's car, she thought she hit her brakes. However, the accident report indicates that she told law enforcement, "[w]hen I went I heard the squeal. I punched it but I got hit."

PROCEDURAL HISTORY
¶ 7. Approximately a year-and-a-half after the accident, Callahan filed her complaint, thereby initiating a cause of action against Lee County and Ledbetter. A bench trial was held pursuant to the Mississippi Tort Claims Act in the Circuit Court of Lee County on January 9 and 10, 2007. Ultimately, the trial court ruled in favor of Callahan and Holst.[3] However, *1224 the trial court apportioned 35% fault to Callahan. Additionally, the trial court awarded Callahan and Holst $3,000 and $40,000 in total damages, respectively, to be reduced by Callahan's portion of fault. Foregoing their ability to file post-trial motions, Callahan and Holst appealed.

STANDARD OF REVIEW
¶ 8. Where a trial court sits without a jury, its findings of fact will not be disturbed so long as there is substantial evidence in the record to support them. Ezell v. Williams, 724 So.2d 396, 397(¶4) (Miss.1998). "This Court must examine the entire record and accept that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact." Id.

ANALYSIS

I. WHETHER THE TRIAL COURT ERRED IN APPORTIONING A DEGREE OF FAULT TO CALLAHAN.
¶ 9. Rule 8(c) of the Mississippi Rules of Civil Procedure requires that "[i]n a pleading to a preceding pleading, a party shall set forth affirmatively ... contributory negligence ... and any other matter constituting an avoidance or affirmative defense." The record shows that Lee County failed to do so. Callahan and Holst argue that because Lee County failed to plead contributory negligence in its answer, it waived the ability to raise the issue of contributory negligence at trial. Therefore, they claim the trial court erred in reducing Callahan's and Holst's awarded damages. In support of their position Callahan and Holst cite Hertz Commercial Leasing Division v. Morrison, 567 So.2d 832 (Miss.1990). However, Morrison is readily distinguishable from the instant case; therefore, it is inapplicable to our analysis.
¶ 10. In Morrison, Morrison leased monitoring equipment through Hertz, but after the equipment ceased to properly function, Morrison stopped making payments. Morrison, 567 So.2d at 833. Hertz filed a complaint against Morrison and, through the use of an acceleration clause in the lease, demanded a sum that was ten times the remaining balance of the lease. Id. at 833-34. Morrison responded and raised certain defenses, but failed to raise the affirmative defense of illegality or "contract penalty." Id. at 833. Nevertheless, the trial court adjudged the acceleration provision an unenforceable penalty and only awarded Hertz the balance due on the lease. Id. at 834. Hertz appealed and argued that the trial court erred in reducing their award because Morrison never raised the defense as required by Rule 8(c); thus, it was waived. Id. On appeal, the supreme court agreed with Hertz's position and remanded the case for a new trial. Id. at 837. However, unlike the instant case, the supreme court noted that the Morrison record showed that "the penalty issue was not tried by express or implied consent" pursuant to Rule 15(b) of the Mississippi Rules of Civil Procedure. Id. at 836 n. 2.
¶ 11. Rule 15(b) allows amendment of the pleadings, stating: "[w]hen issues not raised by the pleadings are tried by [the] expressed or implied consent of the parties they shall be treated in all respects as if they had been raised in the pleadings." M.R.C.P. 15(b). Additionally, even upon objection of the argument on a non-pled issue "the court may allow the pleadings to be amended and shall do so freely when *1225 the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the ... defense upon the merits." Id. Further, the supreme court has held that Rules 8(c) and 15(b) are harmonious in application. See Red Enters., Inc. v. Peashooter, Inc., 455 So.2d 793, 795-96 (Miss. 1984) (reversing a trial court's ruling denying an amendment pleading the defense of accord and satisfaction regardless of the fact that the adverse party objected at trial).
¶ 12. In the instant case, Lee County raised the issue of comparative negligence on two separate occasions during the trial. Lee County stated, "we believe that this is a case that there's a degree of fault on both parties. The county readily acknowledges that there is some degree of fault in this trial [attributable to the county]. However, we say that there's also a degree of fault on Mrs. Callahan, who was driving the vehicle." Additionally, after Callahan and Holst rested their case, Lee County again stated that:
the county's position is that it bears some degree of fault for this collision. However, we think that the proof is clear at this point, even without our having to put on any proof, that this accident resulted because of the negligence of both of the drivers in this case. And we would ask the Court under Rule 41 to make a finding as to that effect.
Callahan and Holst did not voice an objection at either request for the trial court to apply comparative negligence. Therefore, we find that this issue is without merit.

II. WHETHER THE TRIAL COURT ERRED IN FINDING CALLAHAN WAS CONTRIBUTORILY/COMPARATIVELY NEGLIGENT.
¶ 13. The trial court found that Callahan shared in the responsibility for the collision to the tune of 35% fault. In its order, the trial court stated that:
[t]he school bus was extremely large, bright yellow, and required some time to travel the distance to the scene of the collision. This Court in its role as fact-finder, considers this to be evidence of Mrs. Callahan's failure to maintain a proper lookout, especially when considered in view of the fact that the driver, Mrs. Callahan, failed to apply her brakes with sufficient force to bring the vehicle under control. Her testimony was that she saw the bus as she approached and that it, the bus, moved into her lane when she was too close to avoid the accident. She further testified that she "skidded" six to ten feet before impact. This testimony does not comport with reason and probability.
Callahan argues that the record lacks substantial evidence to show that she shared in the negligence that caused the accident; thus, the trial court erred in assigning her a portion of fault.
¶ 14. Information concerning the accident came from only two sources: the live testimony of Callahan and the deposition of Ledbetter. Additionally, an incident report resulting from the accident was attached as an exhibit to Ledbetter's deposition. However, the record reflects that it was only admitted for identification purposes.
¶ 15. Callahan testified that she was following her brother's red truck and traveling north on the Trace. She testified that there was a detour from the Trace as a result of construction. Less than a mile after she turned back on to the Trace, she approached County Road 261 and saw Ledbetter's bus to her left, stopped at a stop sign. She stated that there was nothing *1226 that could have blocked Ledbetter's vision and described the area as "a flat piece of land with no trees around" for one-half of a mile to a mile back. Callahan testified that she was traveling at no more than fifty miles per hour, and because she was a cautious driver, she raised her foot off the accelerator when she saw the bus, but she did not apply the brakes. She further stated that at the moment of impact her best guess as to the bus's speed was five miles per hour. As Callahan came within two car lengths of the motionless bus, the bus pulled out in an effort to cross the Trace and continue on County Road 261. Callahan testified that "all [she] could do was slam on [her] brakes." However, Callahan stated she slid six to ten feet before colliding with the mid-to-front portion of the bus. Callahan claimed that she heard her brakes squeal as she slid toward the bus. Callahan further testified that after the wreck, she remembered Ledbetter saying that "I seen [sic] the red truck go by" and "I thought I looked."
¶ 16. Ledbetter's deposition testimony was read into the record. At the time of the accident, she had been a school bus driver for seventeen to eighteen years. Ledbetter stated that prior to the accident, she had finished her route, but she still had students on the bus. While at the intersection of the Trace and County Road 261, Ledbetter attempted to determine where the remaining students were supposed to have gotten off the bus. She stated that the area surrounding the intersection was clear and flat and that she could see approximately one mile down the Trace. She testified that the north bound side of the Trace was closed because of construction, but when she stopped, she looked to her right and left and did not see anything coming from the south, including Callahan's vehicle or any vehicle preceding it. After south-bound traffic cleared, Ledbetter proceeded across the Trace. She testified that at this point, she turned her head to the right and saw Callahan's vehicle through the bus's door approximately twenty-five to thirty feet from the bus. Ledbetter testified that the only thing she could have done to avoid the accident was look up and down the Trace a second time. Ledbetter testified that the bus's door had passed the center line of the Trace and that the Callahan vehicle struck the bus just behind the door. Ledbetter estimated that it took her two seconds to get from the stop sign to the point of collision. She stated that she did not hear any squeal from either the bus or Callahan's vehicle, but she did believe that she hit her brakes. When asked about her statement of "when I went I heard the squeal. I punched it but I got hit" to the park ranger who first responded to the scene, Ledbetter stated that she did not think she gave that statement and did not remember talking to an officer at all.
¶ 17. Lee County contends that the trial court was correct in its holding and cites Thompson ex. rel Thompson v. Lee County School District, 925 So.2d 57 (Miss. 2006) in support of its position. Thompson was factually similar to the case at hand in many respects. In late 1998, Thompson was traveling on Romie Hill Road in Lee County, which happens to be a two-lane road. Thompson, 925 So.2d at 59(¶2) (quoting Thompson v. Lee County Sch. Dist., 925 So.2d 121 (Miss.Ct.App.2005)). As Thompson neared the intersection of Romie Hill Road and County Road 300, a Lee County school bus driven by Gregory pulled out in an attempt to cross the road, and a collision occurred. Id. The supreme court described the conditions of the day as follows:
This accident occurred on a clear day; the roads were dry; and driver visibility (for vehicles both on Romie Hill Road *1227 and [County Road 300]) was virtually unobstructed due to the clear weather, the road conditions and the terrain in the area of the accident. [Thompson] was driving his 1999 Chevrolet truck in a northerly direction on Romie Hill Road, and Gregory was driving his 1994 International school bus eastbound on [County Road 300] in Shannon. Both [Thompson] and Gregory had a clear and unobstructed view of the intersection of Romie Hill Road and [County Road 300] as they approached this intersection. Unquestionably, [Thompson] had the right-of-way because he had no stop signs or traffic lights which would require him to stop his vehicle or otherwise reduce his speed. On the other hand, Gregory had a stop sign which he was required to honor as he approached Romie Hill Road traveling east on [County Road 300].
Gregory, a school teacher at Shannon for thirty years, and a Lee County school bus driver for twenty-seven years, was very familiar with the intersection of Romie Hill Road and [County Road 300]. Gregory testified that he came to a complete stop at the stop sign. This testimony is unrebutted in the record because [Thompson] did not testify (and Gregory and [Thompson] were the only eyewitnesses to the accident) and is corroborated by Officer Gwin's testimony....
[Thompson] does not contest that Gregory stopped at the stop sign, but instead focuses on the fact that while Gregory was stopped at the stop sign, his attention had been diverted from looking to his right, where he would have seen [Thompson's] vehicle, because Gregory was looking to his left and observing a southbound vehicle on Romie Hill Road. According to Gregory, he was waiting at the stop sign for the southbound vehicle to pass through the intersection, but instead, this vehicle gave a turn signal and turned into a store parking lot prior to entering the intersection; once that vehicle turned, he looked in both directions, determined the road was clear, and proceeded slowly through the intersection. [Thompson]'s theory is that Gregory's attention was diverted by the southbound vehicle on Romie Hill Road, that Gregory entered the intersection without looking back to his right to observe [Thompson]'s northbound vehicle, and that Gregory's inattention was the sole proximate cause of the accident. Gregory admitted he never saw [Thompson's] vehicle until after the collision. However, Gregory firmly asserted throughout the hearing that he looked both to his right and to his left before entering the intersection stating that after he observed the southbound vehicle turn into the store parking lot, he looked back to the right for northbound traffic, and, observing none, he slowly entered the intersection.
Thompson, 925 So.2d at 65-66 (¶¶12-13) (footnotes omitted). Furthermore, the trial court in Thompson concluded that the accident occurred in Thompson's lane after the school bus had crossed over the center line of Romie Hill Road. Id. at 67 (¶14). The supreme court stated, "[t]his evidence would certainly go to the issue of whether [Thompson] was contributorily negligent." Id.
¶ 18. Ultimately, the Thompson trial court assessed 50% fault to both parties; however, on appeal this Court reversed the trial court's apportionment of fault to Thompson. Id. at 58-59(¶1). This Court's opinion was reversed by the supreme court as it found the trial court's findings were supported by substantial evidence. Id. at 71(¶20). Specifically, the supreme court stated:

*1228 Gregory testified he came to a complete stop at the stop sign on [County Road 300]. This fact was corroborated by the testimony of Officer Gwin. Gregory testified that he looked both ways for oncoming traffic on Romie Hill Road before entering the intersection, and saw no oncoming northbound traffic on Romie Hill Road. Upon deciding to enter the intersection, Gregory had to start his school bus from a dead stop and he was traveling between five to seven miles per hour at the time of the collision, which occurred in [Thompson]'s lane of travel. In referring to the photographs of the accident scene, both Gregory and Gwin testified that not only Gregory, but also [Thompson], had a clear unobstructed view of the intersection as they approached the intersection from their respective directions. The trial judge found that Gregory's school bus was hit by [Thompson's] truck "apparently in a fairly head-on circumstance," thus indicating a lack of evasive action on the part of [Thompson].
If a person is adhering to the statutory mandate of Section 63-3-805 when operating a motor vehicle on the roads and highways of this state, that person is engaging in an exercise of common sense. Just because a person may be driving on a through highway with the lawful right-of-way to proceed through an intersection with another road where there are located stop signs, does not mean that person may approach and enter the intersection with impunity and without exercising caution. The trial judge in today's case had to make such determinations from the record as to (1) whether any vehicles traveling on Romie Hill Road constituted an immediate hazard at the time Gregory entered the intersection; (2) whether Gregory proceeded cautiously through the intersection; and, (3) whether [Thompson] was under a statutory duty to yield the right-of-way to Gregory after Gregory entered the intersection.
Id. at 71 (¶¶20-21).
¶ 19. The trial judge in the case at hand, who coincidently was the same trial judge in Thompson, was faced with a remarkably similar set of facts. A yellow Lee County school bus was stopped at an intersection with a through highway. There was nothing to obstruct the views of either driver, and visibility was not a factor as both parties could see for over a mile down the stretch of the Trace involved. Ledbetter stated in her deposition that she looked up and down the Trace before negotiating the intersection and did not see any vehicles coming from the south. At that point, Ledbetter pulled into the intersection, and the bus crossed the centerline before coming into contact with Callahan's vehicle.
¶ 20. Ledbetter stated that it took her approximately two seconds to arrive at the point of impact; while Callahan testified that the bus moved into the Trace when she was but two car lengths away from it. As identified by the trial court, when viewed together, neither of these approximations "comport with reason and probability." Callahan testified she was traveling at no more than fifty miles per hour. Simple arithmetic dictates that fifty miles per hour equates to approximately seventy-three feet per second. Had Ledbetter attempted to cross the Trace when Callahan's vehicle was two car lengths away it would have taken Callahan less than half a second to clear Ledbetter's lane of travel, much less than Ledbetter's estimation of two seconds, which is also suspect.
¶ 21. As noted by the supreme court in Thompson, Mississippi Code Annotated section 63-3-805 is a statute mandating common sense. It states that:

*1229 The driver of a vehicle shall stop as required by this chapter at the entrance to a through highway and shall yield the right-of-way to other vehicles which have entered the intersection from said through highway or which are approaching so closely on said through highway as to constitute an immediate hazard. However, said driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on said through highway shall yield the right-of-way to the vehicle so proceeding into or across the through highway.
The driver of a vehicle shall likewise stop in obedience to a stop sign as required by this chapter at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed.
Miss.Code Ann. § 63-3-805 (Rev.2004). The trial court was faced with the following facts: an accident that occurred on a flat, straight road in the late afternoon; the fact that a large, yellow school bus had the time to completely occupy the Trace with a good portion of the bus past the center line before colliding with Callahan's car; deposition testimony from Ledbetter that she did not see Callahan's car; and incredible versions as to the amount of time between when Ledbetter pulled into the Trace and when the bus arrived at the point of collision. Based upon the evidence before us, we cannot say the trial court's holding was without substantial evidence. This issue is without merit.

III. WHETHER THE TRIAL COURT ERRED IN REDUCING HOLST'S RECOVERY BY 35%.
¶ 22. After fixing Holst's damages at $40,000, the trial court applied the previously established percentages of fault and held that Holst was entitled to $26,000 from Lee County. Callahan and Holst argue that the trial court erred by imputing Callahan's assigned fault to Holst. However, it is clear from the trial court's order that the allocation of fault assigned to Callahan was not imputed to Holst, but applied to her award of damages.
¶ 23. The version of Mississippi Code Annotated section 85-5-7 in place when Callahan and Holst filed their complaint stated in point:
[e]xcept as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault.
Miss.Code Ann. § 85-5-7(3) (Rev.1999). Therefore, Lee County was only liable for the portion of fault assigned to it applied to the total amount of damages awarded to Holst. In the instant case, this amounted to 65% of $40,000, or $26,000. This issue is without merit.

IV. WHETHER THE TRIAL COURT ERRED IN DETERMINING THE AMOUNT OF DAMAGES.

A. Damages to Holst.
¶ 24. Holst argues that the trial court erred in fixing her damages at $40,000. She claims that in so doing the trial court ignored the overwhelming weight of the evidence. Lee County argues to the contrary.
¶ 25. The supreme court has recently reiterated the standard of review *1230 employed when examining a fact-finder's award of damages for error as follows:
In Lewis v. Hiatt, 683 So.2d 937, 941 (Miss.1996) this Court reasoned that "it is primarily the province of the jury [and the judge in a bench trial] to determine the amount of damages to be awarded and the award will normally not be set aside unless so unreasonable in amount as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." Id. (quoting Harvey v. Wall, 649 So.2d 184, 187 (Miss.1995)).
Thompson, 925 So.2d at 72(¶23). Further, a trial court's decision as to damages will not be disturbed so long as the ruling is supported by substantial, credible, and reasonable evidence. DePriest v. Barber, 798 So.2d 456, 459(¶10) (Miss.2001). With this standard in mind, we shall review the evidence pertaining to damages before the trial court in regard to Holst.
¶ 26. In 1997, as a result of degenerative disc disease and a ruptured cervical disk that would not respond to conservative treatment, Holst submitted to having an anterior cervical fusion. She testified that as a result of the surgery she was virtually pain free until the August 2000 accident.
¶ 27. Following the August 2000 accident, Holst went to the hospital for treatment. After this initial post-accident visit, Holst returned because of the increased pain she was experiencing. Eventually, she was treated by Dr. George Hammitt III, a pain management specialist, whom she continued to see through the date of the trial. Holst also saw various medical professionals from 2000 to 2006 concerning the pain she was experiencing. As evidence of her expenses, she entered a compilation of receipts concerning her medically related charges from her initial visit to the hospital to a 2006 visit with Dr. Hammitt, totaling $106,560.36. The bulk of the expenses was incurred as a result of pain management, including prescriptions, Dr. Hammitt's treatments, and related charges.
¶ 28. Dr. Hammitt stated that:
most people have some pain component from a cervical fusion. I feel that according to her history and according to the possibilities of a wreck andand the trauma there could have worsened her condition, but I do not necessarily feel that she would have been pain free from her previous diagnosis without the accident.
When asked if the accident increased Holst's pain, Dr. Hammitt responded, "[I] feel like it probably did. There again, pain is subjective. No one knows except her...." Dr. Hammitt stated that Holst had "significant cervical degenerative disc disease andand lumbar disc disease prior to the accident." Dr. Hammitt further diagnosed Holst with cervical fusion, facet arthropathy, and degenerative disc disease. When asked if the symptoms Holst was experiencing resulted from the accident, Dr. Hammitt stated, "[t]he symptoms that I see are consistent with someone who has degenerative disc disease[,] who in the cervical's had a fusion[,] and in the lower has some discs that are protruding, but not who is worsened from some type of trauma." However, Dr. Hammitt also stated that the facet disease and aggravation of Holst's degenerative disc disease were common with car wrecks. Additionally, when asked if it was his opinion that the accident exacerbated Holst's pain, Dr. Hammitt stated, "[C]orrect. And that's according to her history [that she provided] to me was that it had exacerbated and worsened since the wreck had occurred," but he reiterated that pain is subjective to the patient. Dr. Hammitt stated that the pain can be measured by comparing *1231 her activity and ability levels pre-wreck to post-wreck. However, Dr. Hammitt stated that the fact that Holst did not need pain treatment prior to the wreck, but after the wreck Holst and her family practitioner felt pain management was necessary tends to show that she had increased pain as a result of the accident. Callahan, Holst, and Roy Park, Holst's son, all testified that Holst's general physical condition worsened after the August 2000 accident. Specifically, they testified that she was unable to do the things she did before the wreck to the same level of activity, such as house work and yard work. Regardless, Dr. Hammitt stated that he could not say to a reasonable degree of medical certainty whether Holst would have needed pain management regardless of the accident. Finally, Dr. Hammitt's overall opinion was that the wreck aggravated Holst's degenerative disc disease.
¶ 29. Dr. Michael Currie, a neuroradiologist, testified on behalf of Lee County. He initially reviewed a series of images from 1997, a series of images from 2000, and a series of images from 2002 in an effort to familiarize himself with Holst's condition. Dr. Currie testified that Holst's 1997 studies showed that "she had a considerable amount of preexisting disease in her cervical spine." When asked if he had an opinion as to whether Holst sustained an injury as a result of the accident, Dr. Currie stated:
I have a radiographic opinion, yes.... And that is that if you'll look radiographically at the studies serially from one series of films to the other, that there's really no change in the examinations prior to the trauma or right at the point in time of the trauma compared to the studies later on....
Dr. Currie then testified in detail as to the specifics of Holst's 1997, 2000, and 2002 image studies. He then stated, "[r]adiographically there's no change, which would suggest that there's really no significant injury that would be causing any kind of a deformity of either the bones or any of the major ligamentous structures." Dr. Currie further claimed that:
And she doesn't have any changes over the five-year period of the two films and over the two-year period from her trauma and that phase there, so that would [suggest] to me that she does not have any significant long-term physiological or anatomic destabilization of her spine that would cause her any long-term problems.
¶ 30. On cross-examination Dr. Currie testified that he did not see anything wrong with the treatments that Holst was receiving from Dr. Hammitt. Additionally, he stated that he could not say to a reasonable degree of medical certainty whether the money spent to alleviate Holst's professed pain was not correctly spent. Further, Dr. Currie stated that Dr. Hammitt would be in a better position to know Holst by virtue of the fact that Dr. Hammitt physically treated her, and that Dr. Hammitt would be in a better position to determine if there was a causal connection between the wreck and Holst's pain.
¶ 31. The trial court found Dr. Currie's testimony to be more convincing and found that Holst incurred no permanent injury as a result of the accident. Holst suggests that because Lee County did not contest the authenticity of the medical bills admitted into evidence, the necessity and reasonableness of the bills were conceded. Mississippi Code Annotated section 41-9-119 (Rev.2005) creates a presumption that proof of medical bills acts as prima facie evidence of their reasonableness and necessity. However, such a presumption is rebuttable and the ultimate determination is for the finder of fact *1232 to make. Herring v. Poirrier, 797 So.2d 797, 809(¶38) (Miss.2000). Additionally, a finding that medical bills are reasonable and necessary does not equate to a finding that those bills were incurred as a result of a defendant's negligence. Id. at 809(¶39).
¶ 32. Dr. Currie testified that while he did not see anything wrong with the treatments Holst was receiving from Dr. Hammitt, his opinion was that the wreck did not cause any long-term trauma, and Holst should have recovered no more than six months after the accident. The trial court chose to place more weight on the testimony of Dr. Currie. As such, we cannot say that the trial court's decision was without substantial evidence. Also, given Dr. Currie's testimony, and the trial court's findings, we cannot say the amount of damages awarded to Holst was unreasonable. Therefore, this issue is without merit.

B. Damages to Callahan.
¶ 33. The trial court awarded Callahan $3,000 in total damages. Callahan argues that this amount was clearly erroneous because of the amount of mental and physical trauma she experienced. Callahan's suffered from general soreness as a result of the accident, and she incurred a total of $45 in medical expenses. Additionally, she testified that she suffered mental injury as a result of seeing her son and mother injured. Specifically, Callahan testified that her mother was much less active and her son was injured at the scene and suffered from headaches and nausea for several weeks after the accident. Additionally, she testified that she could not eat or sleep for a time and lost five pounds in one week. As a result, her doctor prescribed Xanax. However, she neither received treatment for emotional distress nor described how her distress affected her life other than it made her more protective of her son than she was before the accident. Based upon the evidence in the record, we cannot say the trial court erred in fixing Callahan's total damages at $3,000. This issue is without merit.
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE AND CARLTON, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.
NOTES
[1] Ledbetter passed away prior to the suit going to trial.
[2] Lee County settled Callahan's son's claim prior to going to trial.
[3] The trial court also dismissed Ledbetter's estate from the cause of action as the court determined that, at the time of the accident, Ledbetter was an employee acting within the scope of employment and, therefore, immune from personal liability.